# In the United States Court of Federal Claims

No. 08-582C

(Filed: August 22, 2012)

```
*******************************  *
                                 *
                                 *
INNOCENT ALOZIE et al.,          *
                                 *
                                 *  Overtime Claim Filed By ICE Law
                   Plaintiffs,   *  Enforcement Officers; Availability
                                 *  of Meal Break; Regularly Scheduled
   v.                            *  Overtime; Fair Labor Standards Act;
                                 *  Administratively    Uncontrollable
THE UNITED STATES,               *  Overtime; Burden of Proof.
                                 *
                   Defendant.    *
                                 *
*******************************  *
```

*David Ricksecker*, with whom was *Gregory K. McGillivary*, Woodley & McGillivary, Washington, D.C., for Plaintiff.

*Matthew F. Scarlato*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Todd M. Hughes*, Deputy Director, and *Kimberly I. Kennedy*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

This case concerns the claims of 58 current or former law enforcement officers to be paid time-and-one-half overtime compensation for their daily 30-minute lunch break. Plaintiffs work as Detention and Deportation Officers ("DDOs") or Immigration Enforcement Agents ("IEAs") in the Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), Philadelphia, Pennsylvania Field Office. Plaintiffs' claims are for back pay and liquidated damages under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2006) ("FLSA"). Plaintiffs allege that they are entitled to overtime compensation for meal periods because their daily work schedules were irregular, and at all times they were expected to work through their meal periods.

The case requires the Court to enter the murky world of overtime pay for federal law enforcement officers who are eligible for two separate types of overtime compensation.  The first type is for regularly scheduled overtime, payable at a premium of one-and-one-half times a normal rate when the overtime is scheduled in advance of the employee's administrative workweek.  The second type is for administratively uncontrollable overtime ("AUO"), payable at an employee's normal rate of pay at various percentages of salary up to a maximum of 25 percent per year.  AUO is for irregular or occasional overtime work that has not been scheduled in advance of the administrative workweek.  The AUO percentages of salary are set at 10, 15, 20, or 25 percent, depending upon the number of overtime hours worked by an employee during a prior computation period.  Regularly scheduled overtime and AUO are mutually exclusive, and the two types cannot be claimed for the same hours of work.  See Bennett v. United States, 4 Cl. Ct. 330, 336-38 (1984).

As will be shown, much of the work performed by these law enforcement officers is generally the same throughout the day, but the rate of pay may be different for the same tasks depending on when the work is performed and whether it was scheduled as overtime in advance of the administrative workweek.  Regularly scheduled overtime is the most valuable to an employee because it carries a premium of one-and-one-half times a normal rate, but employees also are motivated to "get their hours" in the amounts needed to qualify for the higher AUO percentage rates.  Id. at 344.  Abuse undoubtedly exists with the AUO system when employees spend extra hours on the job just "to get their hours" rather than tending to true unexpected emergencies.  The abuse is aided by complicit agency supervisors who are willing to allow employees to pad their salaries with extra hours that may be unnecessary.

The law enforcement officers here already received AUO credit and one-half the normal rate of pay for their 30-minute meal period.  They did this by recording 30 minutes as "FLSA Meal" on their time sheets each day, as part of their normal eight and one-half hour shift.  Plaintiffs argue, however, that they are entitled to premium overtime at one-and-one-half times their normal rate of pay because they always were on duty working through their meal periods and indeed were expected to work instead of taking a 30-minute meal break.

The Government contends that Plaintiffs received appropriate compensation each day when they recorded one-half hour as "FLSA Meal" during their eight and one-half hour shift.  By scheduling one-half hour as "FLSA Meal," the Government argues that Plaintiffs' supervisors had built an off-duty break into the daily schedule and did not expect the officers to work through this break.  If Plaintiffs did work through their meal break, they already have been compensated with AUO pay under the procedures of the Federal Employees Pay Act, 5 U.S.C. § 5541 et seq. (2006) ("FEPA").

The Court conducted a four-day trial on February 14-17, 2012 in Washington, D.C. and heard the testimony of thirteen witnesses. Plaintiffs offered six witnesses who were employed as IEAs or DDOs, and one damages witness. The parties agree that the testimony of these law enforcement witnesses is representative of what all 58 Plaintiffs would say if called to testify. Defendant presented four witnesses who were supervisors or directors in various ICE offices, a representative of ICE's Laguna Beach, California human resources office, and the Acting Director of ICE's Employee and Labor Relations Office. The parties submitted post-trial briefs containing proposed findings of fact on May 7, 2012, and reply briefs on June 4, 2012. The Court heard closing arguments on June 29, 2012.

After considering all of the evidence and the arguments of counsel, the Court concludes that Plaintiffs' claims are without merit and should be denied. Principally, Plaintiffs failed to establish that any agency supervisor ever directed any of them not to take a meal break. The record supports an opposite conclusion that Plaintiffs were seldom if ever denied the opportunity for a 30-minute meal period of their choosing. If Plaintiffs did work through their meal period, they made this choice voluntarily, not because of any order or direction from a supervisor. To the extent Plaintiffs worked unscheduled overtime, they were compensated in accordance with applicable law and agency regulations governing AUO. Due to the agency's 2008 and 2010 changes to an eight hour daily work schedule with no paid lunch break for its law enforcement officers (see Section I, infra), the controversy here predates those changes. After the 2008 and 2010 changes, the dispute concerning a paid 30-minute meal break no longer exists.

Factual Background[1]

A. Overview of ICE and Its Philadelphia Field Office

Of the 58 Plaintiffs in this case, 42 of them served as IEAs, seven of them served as DDOs, and nine of them served as both IEAs and DDOs at various times. Stip. II, ¶¶ 1-58.[2] The three-year period at issue is from August 14, 2005 to August 14, 2008, the date when Plaintiffs filed their complaint. The Plaintiffs were employed by ICE's Philadelphia Field Office. Stip. I, ¶ 1. The mission of ICE's Enforcement and Removal Operation is to investigate, process, and remove illegal immigrants from the United

---

[1] This Factual Background section comprises the Court's principal findings of fact under Court Rule 52(a). Other findings of fact and rulings on mixed questions of fact and law are set forth later in the Discussion.

[2] Counsel for the parties submitted two joint stipulations of fact, the first on January 17, 2012 ("Stip. I"), and the second on May 7, 2012 ("Stip. II"). At the close of trial, the Court encouraged counsel to submit a stipulation identifying the positions, IEA or DDO, held by each Plaintiff, and the time periods for each. The second stipulation was in response to this request. As will become clear, the daily responsibilities for IEAs and DDOs are significantly different.

3

States. Decker, Tr. 532-33.[3] Plaintiffs are categorized as "non-exempt" under the FLSA, which qualifies them for payment of administratively uncontrollable overtime ("AUO"). Stip. I, ¶ 2; 5 U.S.C. § 5545(c)(2).

ICE's Philadelphia Field Office includes other offices in Pennsylvania, West Virginia, and Delaware. These other offices are in Dover, Delaware; Charleston, West Virginia; Pike County, Pennsylvania; York, Pennsylvania; Berks County, Pennsylvania; Pittsburgh, Pennsylvania; and Allenwood, Pennsylvania. Decker, Tr. 537-38.

Each of these offices had responsibilities for different aspects of ICE's mission. The Pike County office was responsible for detainees located in the state correctional facility on the same premises, as well as for Criminal Alien Program ("CAP") work for the state prison facilities in Lackawanna, Pennsylvania. Bailey, Tr. 1060-61, 1066. The York office was located in the York County Prison, and it had responsibility for all detainees incarcerated in that facility. Decker, Tr. 747; Mitra, Tr. 758. The York office also had responsibility for court duties at the nearby immigration court, escorting immigrants between court and prison, and overseeing the immigrants while in court. Id.

The direct supervisors of the DDOs were called Supervisory Deportation and Detention Officers ("SDDOs"), while the direct supervisors of the IEAs were called Supervisory Immigration Enforcement Agents ("SIEAs"). Stip. I, ¶¶ 7, 9. Each office also had Mission Support employees who performed administrative functions, including the completion of employee time and attendance sheets. Decker, Tr. 544. During a span of eight years, from 2004 to 2012, the ICE Philadelphia Field Office has grown from 65 employees to more than 250 employees. Decker, Tr. 535.

ICE has an office in Laguna Beach, California known as the Laguna Service Center. This office is responsible for human resource functions, such as employee payroll. Decker, Tr. 543. The Laguna Service Center oversees the human resource needs for approximately 11,000, or more than half, of ICE's employees. Hunn, Tr. 967. The Laguna Service Center's payroll specialists often answer questions from ICE employees concerning compensation issues. Decker, Tr. 553-54; Mitra, Tr. 772; Hunn, Tr. 969-70. The Laguna Service Center also conducts manual back pay calculations when employees are to be paid outside of the National Finance Center's automated system. These calculations are conducted at least monthly. Hunn, Tr. 974-75. The Laguna Service Center's payroll operations are audited by an outside auditor once per year. The auditor conducts the audit by taking a random sample of employee pay data to ensure that ICE is compensating its employees in accordance with law. Hunn, Tr. 976, 1011.

---

[3] Citations to the evidentiary record are as follows: (i) the testimony of witnesses is identified by name of the witness and transcript page; and (ii) documentary exhibits are identified by Plaintiffs' exhibit number ("PX __"), or Defendant's exhibit number ("DX __").

B. Employee Training

ICE's Mission Support personnel are responsible for new employee orientation. Denise Warren is the supervisor for this group. She has handled new employee orientation since the 1990s. Decker, Tr. 551-52. During orientation, new ICE employees receive a checklist to assure they receive all necessary documents, including ICE's union contract and information concerning hours and pay issues. Decker, Tr. 549, 552. If Plaintiffs or other employees had any questions about their daily schedule or compensation, they could ask their supervisors, or main office personnel in Philadelphia, or personnel at the Laguna Service Center. Decker, Tr. 553-54. Plaintiffs and other employees also had access to various documentary resources regarding administrative or compensation issues. ICE maintained an internal web-based system called "PowerPort" that could address these areas. Decker, Tr. 562-63. ICE's Detention Removal Operations Manual contains a chapter on overtime pay administration. PX 5; Decker, Tr. 583-85.

ICE's supervisory personnel received periodic reminders concerning the proper administration of overtime pay. PX 10; Decker, Tr. 572-75; Mitra, Tr. 771-72. SIEAs and SDDOs received supervisory training at the Leadership Development Center in Texas. This training included instruction on how to schedule and track employees' work hours. Mitra, Tr. 771; Bailey, Tr. 1101. For new employees in the Philadelphia Field Office, supervisors or Mission Support personnel instructed employees how to fill out time sheets, and explained ICE's expectations regarding shifts and hours. Mitra, Tr. 766; Bailey, Tr. 1102. Employee supervisors were regularly available to answer any questions about hours or compensation. Bailey, Tr. 1102. Each ICE office had at least one union steward available for consultation. Mitra, Tr. 767-68.

C. Duties of Law Enforcement Officers

Like many law enforcement officers, Plaintiffs' daily work duties often are unpredictable. Stip. I, ¶ 10. Generally, IEAs and DDOs are responsible for the investigation, detention, and removal of illegal immigrants in the United States. Id. ¶ 4.

1. Detention and Deportation Officers

Typically, DDOs were assigned a docket of immigrants and were responsible for processing them through immigration court proceedings, securing necessary travel documents, and assuring that illegal immigrants ultimately were deported. Stip. I, ¶¶ 5, 6; Boothe, Tr. 324-25; DX 46, Sabins Dep., Tr. 16-17. The DDO position essentially was a desk job. Common assignments included filling out forms, conducting background checks, and talking by telephone with foreign officials or prison administrators. DDOs rarely worked outside the office, and if they did, it was usually in response to an emergency. Boothe, Tr. 324-25; DX 46, Sabins Dep., Tr. 11-12; Mitra, Tr. 761. DDO's

5

typically would handle all issues relating to an immigrant's case and then coordinate with SEIAs and IEAs to carry out necessary transportation duties. Boothe, Tr. 325.

While SDDOs generally assigned a docket of immigrants to DDOs, SDDOs rarely made specific assignments to DDOs. DDOs were independent, self-sufficient, scheduling and performing their own work. SDDOs provided general oversight to the DDOs, but as long as the DDOs were performing their work properly, SDDOs did not often interact with DDOs on a day-to-day basis. Mitra, Tr. 759-61; DX 46, Sabins Dep., Tr. 8-9.

### 2. Immigration Enforcement Agents

IEAs typically worked with the DDOs in a support role, but they did not report directly to the DDOs. Some of the IEAs' duties overlapped with DDOs, but the primary difference was that IEAs handled immigrant transportation. The IEAs' typical duties included investigating potential illegal immigrants and facilitating the deportation of them from the United States. Stip. I, ¶ 8.

During the relevant three-year period, a significant portion of the IEAs' work duties were out-of-office transport details. IEAs were responsible for international escorts, in-country transportation to airports, transportation to and between prisons, and transportation to foreign consulate offices. Coughlin, Tr. 96; Nusom, Tr. 148. When assigning out-of-office transport details, SIEAs typically issued a G-391 detail form that described the nature of the duties. A G-391 form could be issued several weeks before the assignment, or even after the detail was completed, depending on when the assignment arose and when the supervisor had time to complete the form. Coughlin, Tr. 95-96; Bailey, Tr. 1070-72, 1076.

On an international escort, a team of two or more IEAs would pick up one or more immigrants at a prison, transport them to an airport, escort them on a flight home, and then return to the United States. Decker, Tr. 589; Coughlin, Tr. 132-33.

In-country transportation to airports, called "deports" or "launches," called for two IEAs to pick up one or more immigrants at a prison and transport them to a nearby airport. The IEAs were expected to arrive at the airport at least two hours before the flight. The detail was complete when the immigrant's flight took off. IEAs would then return to their home office. Jackson, Tr. 258-59; Bailey, Tr. 1062.

Prison transports typically required two IEAs to pick up an immigrant at one prison or location and drive him or her to another prison, and then return to the office. Coughlin, Tr. 130-31. Prison runs ranged from short drives to local prisons, to longer trips that could require ten hours or more. Id.

6

For a consulate run, two IEAs would pick up a detained individual and transport him or her to the consulate office of the foreign country to meet with consulate officials as part of the deportation process. The IEAs would remain at the consulate office during the meeting. If travel documents could be obtained for a flight later that day, the IEAs would escort the immigrant to the airport. If not, the IEAs would transport the immigrant back to prison and return to their office. The IEAs usually did not know in advance whether an immigrant would secure the necessary travel documents. Coughlin, Tr. 131-32; Bailey, Tr. 1086-87. For a consulate assignment, SIEAs typically issued G-391 forms during the week of the assignment. Bailey, Tr. 1077-78; DX 12 (Form G-391 issued for same week consulate transport).

IEAs also were assigned to the Joint Prison Air Transport ("JPAT") program, establishing charter flights for the deportation of a group of immigrants to the same country. Bailey, Tr. 1065-66. In addition, IEAs performed court duties for immigrant courts, handling the necessary charging documents and escorting immigrants to and from court. Coughlin, Tr. 49-50; Jackson, Tr. 257; Cuffee, Tr. 359. Occasionally, IEAs received assignments through telephone calls from local authorities, requiring them to respond immediately. Coughlin, Tr. 97.

IEAs performed significant work for the CAP program. SIEAs assigned IEAs one or more prisons, and the IEAs would review the prison rosters to determine the citizenship of the detainees. This program required a mix of in-office and out-of-office work, from reviewing files in the office to interviewing detainees in prison. Coughlin, Tr. 119; Nusom, Tr. 182; Decker, Tr. 631-32; Swanson, Tr. 822; Bailey, Tr. 1062-64. G-391 forms were not used for CAP work. Jackson, Tr. 268.

### D. Plaintiffs' Work Schedules

Plaintiffs' administrative workweek began on Sundays. Stip. I, ¶ 12. During the relevant three-year period, Plaintiffs normally were scheduled for eight and one-half hour shifts for five days per week, from 8:00 am to 4:30 pm. Id. ¶ 11. ICE scheduled Plaintiffs to have an off-duty meal period when working eight and one-half hour shifts. The schedule contemplated an eight-hour work day and one-half hour off duty to eat a meal or take a break in the work day. Decker, Tr. 561; DX 4 at 58, Art. 29(A)(10); PX 5, Sec. 43.3(d). Under Plaintiffs' Collective Bargaining Agreement ("CBA"), ICE agreed that a 30-minute off-duty meal period should occur between the third and fifth hour of any eight and one-half hour shift. Plaintiffs' supervisors did not otherwise schedule a time when Plaintiffs should take their meal break. Mitra, Tr. 766; Bailey, Tr. 933-34; DX 4 at 58, Art. 29(A)(10). The CBA also provided that Plaintiffs would not be scheduled for more than eight hours in a basic work day, which excluded meal periods. DX 4 at 57, Art. 29(A)(3).

When working eight and one-half hour shifts, Plaintiffs' supervisors expected Plaintiffs to take 30 minutes off for a meal or a break. Decker, Tr. 616. Plaintiffs were never told not to take a 30-minute meal break. Coughlin, Tr. 111-12; Jackson, Tr. 280-82; Boothe, Tr. 354; Cuffee, Tr. 362-63, 397; Miller, Tr. 430. Plaintiffs' supervisors never ordered Plaintiffs to work through their scheduled off-duty meal periods in advance of the administrative workweek. The only time a supervisor might have directed a Plaintiff to skip a meal period is if an emergency arose that required immediate attention and it occurred close to a break. Decker, Tr. 618; Mitra, Tr. 782; Swanson, Tr. 936-37.

During the relevant three-year period, when IEAs traveled on out-of-country immigrant transports, they were always scheduled for eight hour shifts, rather than eight and one-half hour shifts, to accommodate the difficulties that IEAs might have in taking a meal break when they had to remain with the immigrants. Coughlin, Tr. 133-34; Decker, Tr. 589; Stip. I, ¶ 14. When working an in-country transport that required a full day, SIEAs in the Allenwood and Pike offices permitted Plaintiffs to record an eight-hour shift excluding a meal period if Plaintiffs did not take a 30-minute break. Swanson, Tr. 915-26; Bailey, Tr. 1089-90, 1124.

When working eight and one-half hour shifts, Plaintiffs also were entitled to two paid fifteen minute breaks each day. Mitra, Tr. 763; Bailey, Tr. 1095.

E. Plaintiffs' Overtime

Plaintiffs often worked additional hours outside of their usual 8:00 am to 4:30 pm shift. When Plaintiffs' supervisors knew about the need to work those additional hours in advance of the workweek, the supervisor altered the usual eight-and-one-half hour shift to best correspond with the anticipated on-duty hours. One example of a shift change is a deportation requiring a late night flight. On those days, the SEIAs would schedule the IEA's shift to begin later in the day to accommodate transportation to a late night flight. Swanson, Tr. 913-14; Stip. I, ¶ 14. Similarly, if a supervisor knew in advance of the workweek that a particular assignment would require overtime, the supervisor would schedule the overtime hours as part of the Plaintiff's shift. This overtime would be paid as "45 Act overtime."[4] Decker, Tr. 565-66; Swanson, Tr. 914-15. DDOs rarely worked any "45 Act overtime." Mitra, Tr. 769.

A significant amount of Plaintiffs' overtime hours was not scheduled in advance of the workweek. This work arose from duties that occurred during the workweek or if additional time was needed to complete a task. Such work was called "AUO overtime." Decker, Tr. 564-65; Hunn, Tr. 990. Plaintiffs were eligible to receive AUO pay, and they

---

[4] The reference to "45 Act overtime" means overtime authorized in advance by a supervisor. Congress enacted the original overtime statute, 5 U.S.C. § 911, in 1945, and it is now codified at 5 U.S.C. § 5542(a) (2006).

8

had discretion to determine when they would work additional hours at any time, whether it occurred before, in the middle, or after their scheduled work hours, or on a scheduled day off. Decker, Tr. 564-65; Swanson, Tr. 927.

AUO premium pay is calculated as a percentage of base salary. Stip. I, ¶ 3. Upon commencing employment as a DDO or an IEA, an individual employee's supervisor would assign that employee an AUO pay-percentage determined by the number of AUO hours the supervisor expects the employee to work. Id. Supervisors adjust that percentage every eight weeks to reflect the actual number of AUO hours worked over the preceding 24 weeks. Id.

Plaintiffs worked so much unscheduled overtime that many of them earned the full 25 percent AUO pay per week allowed by applicable law. To reach a level of 25 percent AUO pay, an employee would need to work at least nine additional hours every week. Coughlin, Tr. 106; Jackson, Tr. 265-66; Boothe, Tr. 350; Cuffee, Tr. 398-99; Miller, Tr. 431. Many Plaintiffs simply worked two or more additional hours each work day to achieve the maximum 25 percent AUO pay. Boothe, Tr. 351; Cuffee, Tr. 399; Decker, Tr. 719.

F.  Plaintiffs' Time & Attendance Sheets

Plaintiffs were responsible for reporting their hours on Time & Attendance ("T&A") sheets. Mission Support personnel recorded the time in a system called "Web TA." The Web TA system transmitted the hours electronically to the National Finance Center, which is the payroll and human resource service provider for most of the Federal Government. The National Finance Center calculates and processes Plaintiffs' pay based upon the hours submitted. The Office of Personnel Management ("OPM") certifies the National Finance Center's data system. Stip. I, ¶ 13; Decker, Tr. 544-45; Hunn, Tr. 971.

When filling out T&A sheets for each two-week pay period, Plaintiffs would show eight hours of regularly scheduled work each day, plus one-half hour of "FLSA Meal" time to account for their scheduled off-duty meal period. Decker, Tr. 603-04. Plaintiffs also would include supporting documents for their AUO hours of work, and 45 Act overtime. See, e.g., PX 21 at 7714-16.

The T&A sheets in the record provide brief explanations for the AUO time approved for payment. The explanations suggest a lenient standard for AUO payment, showing few if any work emergencies, but rather the continuation of normal day-to-day work. These AUO work descriptions lead to the conclusion that law enforcement officers simply chose to stay at work longer each day because they could, not because there were unexpected emergencies requiring immediate attention. The ICE pay system allowed law enforcement officers to make up to a 25 percent bonus in addition to their normal salary by working more hours than their normal shift. Much of this additional work was not

9

required but was allowed by ICE so that law enforcement officers could add a bonus to their salary.  See PX 15, 17, 21, 23, 25, 27.

For example, the 2007 T&A sheets for Plaintiff Robert Boothe typically show two or 2.5 hours of AUO for the great majority of his work days with a description of "casework," "office work," or "docket maintenance."  PX 15.  Many of Plaintiff Tim Coughlin's 1.5 hour AUO justifications for April 2007 are for "file review" each day from 6:30 am to 8:00 am.  PX 17.  Plaintiff Greg Marino's T&A sheets for pay period five ending February 24, 2007 show two hours of AUO for every work day, some with no descriptive reasons at all.  PX 23.  Many of Plaintiff Jason Nusom's 2007 AUO descriptions simply say "office" or "files."  PX 27.  All of these entries were certified as correct by the employee and approved by a supervisor.

### G. Plaintiffs' Meal Period Practices

When working eight and one-half hour shifts, Plaintiffs knew they were entitled to a 30-minute off-duty break to eat a meal.  Coughlin, Tr. 87-90; Nusom, Tr. 157; Cuffee, Tr. 391-92; Mitra, Tr. 762-63; Bailey, Tr. 1093-96.  Plaintiffs sometimes made a personal choice to work through their meal periods and finish all of their work within an eight and one-half hour shift.  This choice was not made because of supervisors' directions or expectations in advance of the administrative workweek.  Boothe, Tr. 352; Mitra, Tr. 801; DX 46, Sabins Dep., Tr. 57-58.  While in the office, Plaintiffs often ate at their desks, either working or attending to personal matters.  These choices were personal decisions, not the result of any supervisor's directive.  Mitra, Tr. 782.  Sometimes, ICE employees went to nearby restaurants for lunch or to order carry-out meals.  Coughlin, Tr. 102-03; Cuffee, Tr. 399-400.  ICE's York office was near the prison cafeteria, and employees often used that facility for meals.  Mitra, Tr. 785-86.

1. Detention & Deportation Officers

DDOs worked in the office almost every day and always had the opportunity for a meal break.  They each had a docket of immigrant cases, and could decide within their discretion when to work on the cases.  They did not receive specific direction or deadlines from their supervisors.  They could determine whether they wanted to take a meal break or work through their meal period.  Miller, Tr. 438-40; Mitra, Tr. 766; DX 46, Sabins Dep., Tr. 37.  DDOs in the York office would eat in the break room, outside on picnic tables, in the prison cafeteria, or purchase food elsewhere.  Mitra, Tr. 781-82.

Plaintiff Robert Boothe often brought his lunch from home but occasionally would go out for lunch.  Sometimes, Mr. Boothe and other York office employees would order pizza and eat in the break room.  Boothe, Tr. 345, 351-52; Mitra, Tr. 784.  Mr. Boothe's supervisor never told him that he could not take a meal period.  Boothe, Tr. 354.

Plaintiff Bryan Miller always took a 30-minute off-duty meal period when working eight and one-half hour shifts. Mr. Miller's supervisor never told him not to take an off-duty meal period. Miller, Tr. 430.

### 2. Immigration Enforcement Agents

When working in the office, IEAs, like DDOs, always had the opportunity for an off-duty meal unless an unforeseen emergency arose. Swanson, Tr. 931. SIEAs never ordered an IEA to work through lunch unless an emergency arose on a given day. SIEAs trusted Plaintiffs to manage their own work duties and to decide when they could take a meal break. When IEAs were traveling, they could stop work for a meal break when time permitted, without having to report to supervisors. Swanson, Tr. 932-37. They sometimes brought meals or made quick stops at restaurants and then ate in their vehicles. The supervisors did not direct IEAs how they should take their meals. Decker, Tr. 602; Swanson, Tr. 965. On prison and consulate details, IEAs could take their meal break before picking up or after dropping off a detainee. Decker, Tr. 654-56. During court proceedings, IEAs could take a meal break when the court adjourned for lunch. Decker, Tr. 654-55.

When transporting an immigrant to an airport, at least one IEA was required to remain with the immigrant at all times. Once the immigrant's flight took off, IEAs were free to take a meal break while returning to the office. Decker, Tr. 600, 712; Bailey, Tr. 1100. Because ICE required two IEAs to accompany an immigrant, one officer could take a meal break while the other officer remained with the immigrant. Decker, Tr. 601-02. Many airports had holding cells for immigrant detainees, and IEAs were free to leave the immigrant in a cell to take a meal break. Decker, Tr. 601; Bailey, Tr. 1099.

Plaintiff Tim Coughlin took lunch breaks when working an eight and one-half hour shift. Coughlin, Tr. 111. When away from his office, Mr. Coughlin often stopped for food and continued driving. The decision to take a break was his choice. Mr. Coughlin's supervisor never directed him not to stop for lunch. Coughlin, Tr. 111-12; Swanson, Tr. 965. While in the office, Mr. Coughlin typically brought lunch with him and ate at his desk. Occasionally, he would work through lunch, but at other times he would check personal email or read online news. A few times, Mr. Coughlin had lunch at a restaurant. Coughlin, Tr. 102-04, 112-14, 128-29.

Plaintiff Jason Nusom, when working in the office, almost always would drive to a nearby restaurant to buy food for lunch. He typically would eat at his desk while working. He experienced work interruptions while eating, either from telephone calls or emails that required his attention. Nusom, Tr. 187-89. When transporting an immigrant detainee, Mr. Nusom would stop at a restaurant on the return trip from the airport and continue driving. Mr. Nusom's supervisor never told him not to stop for an off-duty break. Nusom, Tr.190-92.

Plaintiff Scott Jackson recalled only two or three instances in three years in which he took a full 30-minute, off-duty meal break. Typically, he would eat while driving, or stop at a gas station for fuel and a sandwich and continue toward his destination. Jackson, Tr. 208-10. Mr. Jackson's supervisor never told him that he could not take a meal break. Jackson, Tr. 281-82.

Plaintiff David Cuffee typically brought his lunch to work when in the office, and he would eat at his desk. When traveling away from the office, Mr. Cuffee usually stopped at a restaurant for food, and then ate while driving. He understood that he was not required to eat while working, but he made this choice as a personal habit. Cuffee, Tr. 362-63, 397. Mr. Cuffee also went to nearby restaurants for meals. Cuffee, Tr. 399-400.

### H. ICE's Meal Period Policy

ICE's Philadelphia Field Office employed an eight and one-half hour work shift from at least as early as 1993. At that time, ICE was part of the U.S. Immigration and Naturalization Service ("INS"). Decker, Tr. 560. From 1993 until 1998, ICE's law enforcement officers were not recording their meal times on time sheets. In 1998, AUO-eligible employees, including DDOs and IEAs, brought a lawsuit alleging that ICE was violating the FLSA (1) by not paying the "half" of the FLSA's time-and-one-half requirement for AUO hours exceeding the 85.5 hour FLSA overtime threshold and (2) by failing to compensate overtime at the rate beyond the 45 Act rate, which was capped at GS Grade 10, step 1. INS changed its FLSA policy in light of this lawsuit and awarded employees FLSA back pay. Decker, Tr. 604-09.

Following this lawsuit, AUO-eligible employees were not recording meal periods on their T&A time sheets. A few months later, INS determined that the FLSA required AUO-eligible employees to be compensated for their meal period. The INS instructed AUO-eligible employees to begin recording their 30-minute meal period as "FLSA Meal" on their T&A sheets. The INS began including "FLSA Meal" time in the FLSA overtime calculation, resulting in an increase in overtime pay. INS gave these employees back pay for meal periods taken before ICE amended its meal period policy. Decker, Tr. 610-13. All of Plaintiffs' time recorded as "FLSA Meal" on T&A sheets counted towards FLSA overtime entitlement whether or not they worked during the meal period. Hunn, Tr. 1004-05.

### I. ICE's Change to Eight-Hour Shifts

ICE agreed to change the regular shifts for its law enforcement officers to eight hours. For IEAs, the change occurred in approximately March 2008. For DDOs, the change occurred in approximately May 2010. Stip. I, ¶ 16.

12

In 2007, the IEAs' union filed a grievance concerning the eight and one-half hour shifts. At a meeting involving union representatives and Mr. Decker, the union requested ICE to change IEAs to an eight-hour shift because IEAs found it difficult to take a 30-minute break. Decker, Tr. 630. Mr. Decker knew historically that IEAs had opportunities for a 30-minute break each day. However, he recognized that IEA duties had changed with the expansion of the CAP program, which required less travel time but more time in prison facilities where there were fewer opportunities for a meal period. Decker, Tr. 633-35.

Mr. Decker spoke with other ICE officials, and in particular, he did not want to interfere with ICE's negotiation of a new union agreement. Mr. Decker also learned that about half of ICE's regional offices were using eight-hour work shifts. Decker, Tr. 640-43. ICE formally changed IEAs to an eight-hour shift after submitting an Article 9(a) notice of the change to the union. Decker, Tr. 641.

Approximately one year later, the union filed a similar grievance concerning the DDOs' eight and one-half hour shift. The union argued that the DDOs' responsibilities had changed because they were working out of the office more often on fugitive surveillances, making it difficult to take a lunch break. Decker, Tr. 645-47. Mr. Decker agreed to this change as well, recognizing the changing nature of the DDOs' responsibilities, and because IEAs already were working the same shift. Decker, Tr. 647-48. After these changes, Plaintiffs were expected to work eight hours per day, but they were no longer entitled to a 30-minute meal break. Decker, Tr. 649-50.

Discussion

A. Standards for Decision

To prevail on an FLSA claim for back pay, Plaintiffs bear the burden to establish all elements of their claim. Abbey v. United States, 99 Fed. Cl. 430, 436 (2011) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946) (an "employee who brings suit for unpaid wages . . . has the burden of proving that he performed work for which he was not properly compensated."). For federal law enforcement officers eligible for two types of overtime compensation – (1) regularly scheduled overtime, and (2) AUO – the only way to recover premium pay of one-and-one-half their normal pay rate is to show that a supervisor scheduled the overtime in advance of the administrative workweek. All other overtime is paid at normal salary rates as AUO. See 5 U.S.C. § 5545(c)(2); 5 C.F.R. §§ 550.151-550.163.

Even if Plaintiffs cannot show actual documentation from supervisors of regularly scheduled overtime, OPM regulations will permit Plaintiffs to recover at the premium rate if they can meet a fact-specific test. Under 5 C.F.R. § 610.121(b)(3), the Court may

grant Plaintiffs relief if it finds that the head of the agency "(i) had knowledge of the specific days and hours of the work requirement in advance of the administrative workweek, and (ii) had the opportunity to determine which employee had to be scheduled, or rescheduled, to meet the specific days and hours of that work requirement." Id. OPM regulations define the "head of an agency" to include any supervisor delegated the power to schedule an employee's overtime. 5 C.F.R. § 610.102.

This regulation requires proof that the supervisor responsible for scheduling the employee's workweek had actual knowledge of the need for the employee to work overtime before the beginning of the workweek. OPM has explained:

> This section requires the head of an agency to reschedule an employee's tour of duty when the specific days and hours required of the employee in the ensuing workweek are known in advance and can be scheduled. The key to this requirement is that the official who is responsible for scheduling the work of employees: (1) Has knowledge of the different work requirement before the administrative workweek begins, and (2) has the capability of determining which employee should have the specific days and hours of his or her tour of duty rescheduled to meet this work requirement. Having this knowledge, the official is responsible for scheduling the work as part of the employee's regularly scheduled tour of duty and such work is "regularly scheduled" work.

48 Fed. Reg. 3931-01 at 3932 (Jan. 28, 1983).

The OPM regulations thus require a factual inquiry to determine whether Plaintiffs' supervisors knew what Plaintiffs' work requirements would be in advance of the workweek. In Aldrich v. United States, 31 Fed. Cl. 554, 556 (1994), Federal Bureau of Investigation ("FBI") agents sought time-and-one-half pay for overtime work during the rededication of the Statue of Liberty. The Government argued that such work was irregular overtime and thus plaintiffs were not entitled to the claimed back pay. The Court agreed with the Government, holding "[a]lthough the evidence clearly establishes that FBI Headquarters was aware of the operation in advance, plaintiffs have not produced evidence that FBI Headquarters knew in advance that they would be assigned to work prolonged hours during their tour of duty." Id. The Court granted summary judgment for the United States, stating:

> Although the facts strongly suggest that the event was scheduled in advance to last seven successive days, plaintiffs have produced no evidence that FBI Headquarters had knowledge of the extended shifts that plaintiffs were working.

14

> One of the requirements of scheduling the work in advance is that the scheduling body must have some notice of the actual work requirements. 5 C.F.R. § 610.121(b)(2) (1986). Because plaintiffs have not presented evidence to establish a factual issue relating to the actual knowledge of FBI Headquarters, we must grant defendant's motion for summary judgment.

Id. at 558 (internal citation omitted); see also Buchan v. United States, 31 Fed. Cl. 496, 499 (1994) (denying cross-motions for summary judgment when evidence presented in discovery failed to demonstrate what the plaintiffs' supervisors knew about plaintiffs' work requirements in advance of the administrative workweek).

### B. Decision of Federal Labor Relations Authority

In a recent decision, the Federal Labor Relations Authority ("FLRA") considered a closely analogous claim by ICE law enforcement officers for time-and-one-half overtime pay during meal breaks. DHS, ICE, & Am. Fed'n of Gov. Emps. Nat'l INS Council, 66 F.L.R.A. 13 (2011). In DHS, law enforcement officers eligible for AUO argued that they should receive FLSA overtime because their meal period work was not irregular or unscheduled. Id. at 16. An arbitrator had ruled in favor of the law enforcement officers, and the FLRA reviewed the arbitrator's ruling.[5]

On review, the FLRA disagreed with the arbitrator's decision. Relying upon judicial precedent, the FLRA held that the law enforcement officers' scheduled meal periods did not constitute regularly scheduled overtime because ICE "did not schedule the overtime work during meal periods in advance [of the workweek] in accordance with [5 C.F.R.] § 610.111, which, as stated above, requires the Agency to establish regularly scheduled overtime, in advance, in a written policy statement." Id. at 15 (citing Bennett, 4 Cl. Ct. at 343, n.39 ("Overtime that [is] added on to every work day of the year [is] 'irregular' if not ordered and directed according to law."); Burich v. United States, 366 F.2d 984, 988-89 (Ct. Cl. 1966) (finding work performed with high degree of frequency and regularity legally insufficient to be regularly scheduled overtime.)) The FLRA's DHS decision is well-reasoned and worthy of deference.

### C. Plaintiffs' Failure of Proof

The evidence presented in this case does not even begin to satisfy Plaintiffs' considerable burden of proof. There is little indication that these law enforcement officers ever were denied the opportunity to take a 30-minute meal break. The situation

---

[5] In fact, Plaintiffs' complaint here likely was based upon the legal theory adopted in the arbitrator's erroneous decision. While Plaintiffs' action was pending in this Court, the FLRA reversed the arbitrator's ruling.

15

is especially clear that DDOs worked in their offices most days, and nearly always took their meal break. Some of the DDOs brought their lunch to work, while others went out to restaurants or purchased food to bring back to their offices. Whenever they did work through their lunch break, the DDOs voluntarily decided to make this choice. None of the DDOs testified that they had received direction from supervisors not to take a meal break.

The circumstances relating to IEAs are a bit more complicated, but they lead to the same result. When IEAs worked in their offices, they nearly always had an opportunity for a meal break, just as the DDOs did. The IEAs, however, spent much of their time traveling and often were not working in the office. They transported illegal immigrants to a variety of locations, including (1) trips to meetings at country consulate offices to arrange for transportation, (2) trips to airports to make sure immigrants boarded aircraft to their home countries, (3) trips to perform escort functions by accompanying immigrants on flights to their home countries, (4) trips to immigration courts for judicial proceedings, and (5) trips to transfer immigrants to a different prison.

It is quite true that meal opportunities can be irregular when IEAs are responsible for transporting immigrants to any of the above locations. Nevertheless, the IEAs all acknowledged that they were able to arrange for meal breaks at some point during their work day. By traveling in pairs, one agent could always stop to buy food while the other agent remained with the immigrant detainees. On return trips to their office after delivering an immigrant to the airport, the IEAs easily would have time for an uninterrupted meal break. When traveling abroad to escort immigrants back to their homeland, IEAs often received an eight-hour tour of duty that did not include a meal break. When engaged in court proceedings, IEAs would have a meal break whenever the court recessed for lunch.

Even if Plaintiffs had made a case that they frequently worked through lunch, there is no evidence that any supervisor directed Plaintiffs not to take a meal break. The most to be said is that Plaintiffs occasionally chose to work through lunch, or on rare occasions, they had to work through lunch due to unexpected emergencies. Plaintiffs made no showing that their supervisors had any knowledge of these circumstances, or that they should have scheduled such work in advance.

With such a clear failure of proof, there is no need for the Court to consider other OPM regulations relating to compensation, to weigh Plaintiffs' arguments for liquidated damages, or to evaluate the application of a three-year damages period due to any willful agency violation of the FLSA. Defendant is correct in asserting that, if anything, Plaintiffs were overpaid to the extent they received AUO compensation for meal periods they did not work. In light of the generous AUO bonus system already available to these Plaintiffs, it is the height of hubris for them to think they should receive time-and-one-half premium pay for their daily lunch break.

## Conclusion

For all of the foregoing reasons, Plaintiffs' complaint is dismissed, and the Court directs the Clerk to enter judgment for Defendant. Pursuant to Rule 54(d), the Court awards reasonable costs to Defendant as the prevailing party.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge
